UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

YOUNG MOON                          )
                                    )
v.                                  )          No.  2:09-0060
                                    )          JUDGE CAMPBELL
UNITED STATES OF AMERICA            )


MEMORANDUM

I.  Introduction

Pending before the Court is a Motion Under 28 U.S.C. § 2255 To Vacate, Set Aside Or

Correct Sentence By A Person In Federal Custody (Docket No. 1), filed by the

Movant/Petitioner (hereinafter "Petitioner").  The Petitioner has also filed her own Declaration

(Docket No. 2), and briefs in support of the Motion (Docket Nos. 3, 25, 33), and the Government

has filed response briefs. (Docket Nos.  14, 31, 32).

The Court has reviewed the pleadings, briefs, and affidavits filed by both parties, the

record of Petitioner's underlying conviction, and the entire record in this case.  For the reasons

set forth below, the Court concludes that Petitioner's Motion To Vacate is DENIED, and this

action is DISMISSED.

II. Procedural and Factual Background

In the underlying criminal case, the Petitioner was originally charged with three counts of

health care fraud in violation of 18 U.S.C. § 1347. (Docket Nos. 1, 7, 51 in Case No. 2:04-

00014). The Petitioner filed a motion to dismiss the charges for failure to allege an interstate

commerce nexus, and the Court granted the motion.  (Docket Nos. 24, 57 in Case No. 2:04-

00014).

The Grand Jury subsequently issued another Indictment that alleged three counts of health care fraud, in violation of 18 U.S.C. § 1347, including allegations of an interstate commerce nexus, as well as one count of making false statements to government agents, in violation of 18 U.S.C. § 1001(a)(2). (Docket No. 1 in Case No. 2:05-00003).

Prior to trial, the Petitioner filed a motion to suppress all evidence obtained from the Petitioner during a search of her business and statements she made during an interview with an agent of the Department of Health and Human Services. (Docket No. 16 in Case No. 2:05-00003). The Court held a hearing and denied the motion. (Docket No. 75, 84 in Case No. 2:05-00003).

Petitioner also moved to dismiss the false statement count on the grounds of prosecutorial vindictiveness, and the Court denied the motion. (Docket Nos. 23, 65 in Case No. 2:05-00003).

At the conclusion of a two-week trial, a jury found the Petitioner guilty of all charges. (Docket Nos. 206, 295-298, 300-305 in Case No. 2:05-00003). Petitioner's trial counsel moved to withdraw after the trial because the Petitioner had obtained substitute counsel, and the Court granted the motion. (Docket Nos. 210, 234 in Case No. 2:05-00003).

The Court subsequently sentenced the Petitioner to a total term of 188 months of imprisonment. (Docket Nos. 289, 290, 306 in Case No. 2;05-0003). Petitioner appealed the conviction and sentence to the Sixth Circuit. (Docket No. 291 in Case No. 2:03-00005). Petitioner's counsel subsequently moved to withdraw, and the Sixth Circuit appointed new counsel to represent the Petitioner on appeal. (Docket Nos. 307, 312 in Case No. 2:05-00003). The Sixth Circuit affirmed Petitioner's conviction and sentence. (Docket No. 349 in Case No.

2:05-00003); United States v. Young Moon, 513 F.3d 527 (6th Cir. 2008). The Petitioner then filed a petition for writ of certiorari to the United States Supreme Court, which was subsequently denied. (Docket No. 373 in Case No. 2:05-00003); Young Moon v. United States, 128 S.Ct. 2493 (2008).

In its opinion, the Sixth Circuit presented the relevant facts as follows:

Defendant, Young Moon, was a medical doctor licensed by the State of Tennessee, specializing in oncology and hematology. Defendant operated a medical practice in Crossville, Tennessee where she treated patients with various forms of cancer. As part of her practice, Defendant contracted with the State of Tennessee to provide medical treatment to patients pursuant to a state and federally funded health benefit program for the uninsured known as 'TennCare.' A number of providers participated in the program, including Blue Cross Blue Shield and Medicaid. Defendant routinely utilized chemotherapy medications such as Taxol, Camptosar and Procrit FN1 in her treatment of cancer patients insured under the program. As a medical provider, Defendant was required to seek reimbursement for services, including medication, provided to patients under the insurance program.

> FN1. Taxol is a chemotherapy medication used by doctors to treat patients with cancer. It is a natural product that is derived from the bark of a Pacific yew tree, which was developed into a drug and approved for treatment of 'an array of tumors.' (J.A. at 757). Camptosar is also a natural product that was developed and approved for treatment of cancer, particularly colo-rectal cancer. Procrit is a medication used to treat the side effects of chemotherapy.

In March of 2001, the Tennessee Bureau of Investigation ('TBI') received a complaint from one of Defendant's employees alleging that Defendant administered partial doses of chemotherapy medication while billing the insurance program for full doses. It was also alleged that the fraud was facilitated by the fact that Defendant mixed the cancer drugs she administered. The matter was referred to the Medicare Fraud Control Unit ('MFCU') of TBI and a joint investigation was initiated between the United States Department of Health and Human Services Office of Inspector General ('HHS-OIG') and TBI. After an initial investigation, agents from HHS-OIG and TBI conducted an 'on site review' at Defendant's office.

3

On January 9, 2002, 10 agents associated with TBI, HHS-OIG and Blue Cross Blue Shield conducted an on-site review at Defendant's office. The objective of the review was to 'scan TennCare, Medicaid and Medicare patient records' and secondarily to 'interview Dr. Moon and all of her employees.' (J.A. at 267) Members of the on-site review team were instructed that 'attire will be business professional, no raid gear. All weapons, police paraphernalia shall be concealed.' (Id.) On the morning of the review, three agents arrived, unannounced, at Defendant's office. The agents identified themselves, informed Defendant of a general complaint against her and requested permission to 'scan' particular patient records. It is unclear whether Defendant was made aware of her right to withhold permission. After asking about the nature of the allegations and being told they were confidential, Defendant told agents it would be 'fine' for them to scan the requested records and that agents could 'scan whatever [they] needed to.' (J.A. at 341) Defendant also provided agents with a location where they could scan the requested files.

During the on-site review, agents requested an interview with Defendant regarding her billing practices. Defendant agreed to be interviewed 'as long as it did not interrupt patient care.' (J.A. at 346) At one point, Defendant left the interview to attend to a patient. During the interview, Defendant stated that she always prescribed full doses of chemotherapy medication and never instructed her staff to give partial doses of medication.

\* \* \*

After further interviews with employees, reviewing bills submitted to relevant health insurance programs and consultation with experts regarding Defendant's patient charts, the government sought an indictment for three counts of health care fraud.

\* \* \*

Defendant went to trial on all four counts enumerated in the superseding indictment and the government was permitted to introduce evidence obtained as a result of its warrantless search of Defendant's office. The trial lasted just over two weeks. During the trial, the jury heard testimony from former employees who recounted that Defendant had instructed them to 'short' medication to patients. The government presented evidence in the form of testimony by Dr. Mace Rothenburg, an expert witness who testified that Defendant could not have administered the amount of medication she billed as the patient side effects were too mild. The government also presented evidence in the form of records from various pharmaceutical companies regarding Defendant's purchases of chemotherapy medication. Despite Defendant's objection to the admission of the business records, the court ultimately ruled that the evidence was admissible

4

under Federal Rule of Evidence 803(6). In addition, Special Agent Robert Turner with HHS-OIG testified regarding Defendant's billing records, patient charts and drug purchases. As part of his testimony, Agent Turner prepared chart summaries of Defendant's billing and purchasing as well as her administration of chemotherapy medication. Again, Defendant objected, but the district court found the summaries to be admissible.

At the close of the trial, Defendant was convicted of all four counts enumerated in the second superseding indictment.

* * *

After Defendant's conviction on all four counts of the indictment, a Presentence Report ('PSR') was prepared in anticipation of sentencing. For purposes of sentencing, the PSR recommended grouping Defendant's convictions for health care fraud with her conviction for making a false statement. The PSR further recommended a number of sentencing enhancements, including enhancements for risk of bodily harm or death, vulnerable victims and obstruction of justice. Consequently, Defendant's total offense level was calculated at 34. The fact that Defendant had no prior criminal history placed her in Criminal History Category I. Together, the base offense level and Criminal History Category yielded an advisory Guidelines range of 151-188 months. On April 24, 2006, the district court conducted Defendant's sentencing hearing. During the hearing, the district court heard testimony from four family members of Defendant's deceased patients. Defendant objected to the admission of this testimony, contending that the patients were not 'victims' of the offenses for which she was convicted. The court overruled the objection, noting that the testimony was 'relevant to the nature and circumstances of the offense' under 18 U.S.C. § 3553(a). (J.A. at 1516)

The court also heard testimony from government witnesses regarding the harm that resulted from Defendant's conduct, including both economic loss and injuries to persons. Additionally, the court reviewed the PSR sentencing recommendations and heard arguments from counsel regarding objections to the PSR. The court rejected Defendant's objections to the application of enhancements for vulnerable victims, risk of death or bodily injury, and obstruction of justice. The district court, however, granted the government's request for an additional two level enhancement for a 'large' number of vulnerable victims. The ruling increased the Guidelines range to 188 to 235 months. Defendant asked for a sentence at the lower end of the Guidelines range in consideration of mitigating evidence offered in the form of patient letters in her favor. After hearing the relevant evidence and testimony, the district court sentenced Defendant.

In sentencing Defendant, the district court acknowledged the advisory nature of the Guidelines and went on to make findings with respect to Defendant's conduct

5

as related to the § 3553(a) factors. In a sealed statement of reasons and before the parties, the district invoked the § 3553(a) factors in sentencing Defendant and found it unnecessary 'to tailor the sentence outside of the advisory Guideline Range in this case to comply with the mandates and purposes of § 3553(a).' (J.A. at 1515-16) Thereafter, the district court sentenced Defendant to 188 months, followed by two years of supervised release. Defendant was also ordered to pay restitution in the amount of $432,000.00 and was remanded into the custody of the United States Marshals.

513 F.3d at 532-34.

## III. Analysis

### A. The Petitioner's Claims

Petitioner contends that her conviction should be vacated because she received the ineffective assistance of counsel and her sentence was imposed in violation of the Ex Post Facto Clause and the Due Process Clause.

### B. The Section 2255 Remedy/Evidentiary Hearing Not Required.

Section 2255 provides federal prisoners with a statutory mechanism by which to seek to have their sentence vacated, set aside or corrected.[1]   The statute does not provide a remedy, however, for every error that may have been made in the proceedings leading to conviction. The statute contemplates constitutional errors, and violations of federal law when the error qualifies as a "fundamental defect which inherently results in a complete miscarriage of justice."

---

[1]  28 U.S.C. § 2255 states, in part:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

6

Reed v. Faley, 512 U.S. 339, 114 S.Ct. 2291, 2296, 2299-2300, 129 L.Ed.2d 277 (1994); Grant v. United States, 72 F.3d 503, 505-06 (6th Cir. 1996).

Rule 4(b) of the Rules Governing Section 2255 Proceedings provides that the Court shall consider the "files, records, transcripts, and correspondence relating to the judgment under attack" in ruling on a petition or motion filed under Section 2255. In addition, where the same judge considering the Section 2255 motion also conducted the trial, he may rely on his recollections of the trial. Blanton v. United States, 94 F.3d 227, 235 (6th Cir. 1996).

An evidentiary hearing is not required if the record conclusively shows that the Petitioner is not entitled to relief. 28 U.S.C. § 2255; Rule 8 of the Rules Governing Section 2255 Proceedings For The United States District Courts; Arredondo v. United States, 178 F.3d 778, 782 (6th Cir. 1999). No hearing is required "if the petitioner's allegations 'cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact.'" Id. (quoting Engelen v. United States, 68 F.3d 238, 240 (8th Cir. 1995)).

The Court has reviewed all the files, records, transcripts and correspondence filed in the proceeding underlying Petitioner's conviction, as well as the pleadings, briefs, affidavits, and records filed by the parties in this case. The Court finds it unnecessary to hold an evidentiary hearing because these records conclusively establish that Petitioner is not entitled to relief on the issues raised.

C. Ineffective Assistance of Counsel

In order to prevail on an ineffective assistance of counsel claim, the burden is on the Petitioner to show: (1) trial counsel's performance fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for the deficiency, the outcome

of the proceedings would have been different. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); Campbell v. United States, 364 F.3d 727, 730 (6th Cir. 2004).

The objective standard of reasonableness "is a highly deferential one and includes a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Campbell, 364 F.3d at 730 (quoting Mason v. Mitchell, 320 F.3d 604, 616-17 (6th Cir. 2003). A reasonable probability is a probability sufficient to undermine confidence in the outcome. Strickland, 466 S.Ct. at 694; Ivory v. Jackson, 509 F.3d 284, 294 (6th Cir. 2007).

As the Supreme Court has explained, a court need not determine whether counsel's performance was deficient before examining whether prejudice resulted from the alleged deficiencies. Strickland, 466 S.Ct. at 697; Ivory, 509 F.3d at 294. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Id.

1.  Trial counsel

Petitioner argues that trial counsel was ineffective based on the following grounds: (1) failure to request a Ratzlaf instruction; (2) failure to direct the jury's attention to the fact that Agent Turner's calculations did not include "rounding;" and (3) failure to object to the jury instruction on reasonable doubt.

Petitioner first contends that counsel should have requested a "willfulness" instruction in connection with the health care fraud charges under the authority of Ratzlaf v. United States, 510 U.S. 135, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994). In Ratzlaf, the Court held that to establish that a defendant "willfully" violated the statute prohibiting the structuring of financial transactions to

8

avoid currency reporting requirements, the government had to prove that the defendant acted

with knowledge that his conduct was unlawful.

The health care fraud statute, 18 U.S.C. § 1347, provides in pertinent part:

Whoever knowingly and willfully executes, or attempts to execute, a scheme or
artifice--

(1) to defraud any health care benefit program; or

(2) to obtain, by means of false or fraudulent pretenses,
representations, or promises, any of the money or property owned
by, or under the custody or control of, any health care benefit
program,

in connection with the delivery of or payment for health care benefits, items, or
services, shall be fined under this title or imprisoned not more than 10 years, or
both. . .

In United States v. Hunt, 521 F.3d 636, 645 (6th Cir. 2008), the court set forth the

elements of health care fraud under Section 1347: "(1) knowingly devised a scheme or artifice to

defraud a health care benefit program in connection with the delivery of or payment for health

care benefits, items, or services; (2) executed or attempted to execute this scheme or artifice to

defraud; and (3) acted with intent to defraud." (Citing United States v. White, 492 F.3d 380,

393-94 (6th Cir. 2007)).

The Sixth Circuit has not explicitly defined the term "willfully" for purposes of Section

1347. In cases decided since Petitioner's trial, other circuits have defined the term "willfully," in

the context of health care fraud, to require a showing that the defendant acted with knowledge

that his conduct was unlawful. See, e.g., United States v. Awad, 551 F.3d 930, 938-41 (9th Cir.

2009); United States v. Franklin-El, 554 F.3d 903, 908 (10th Cir. 2009)(Court finds sufficient

evidence that defendant acted with knowledge that conduct was unlawful by billing for services

9

not rendered and including other false information on claim forms).  In <u>United States v. Awad</u>,

the court held that the instructions given at trial were erroneous because they "told the jury

exactly the opposite of the Supreme Court's definition of 'willfully'. . . " 551 F.3d at 938.  The

instructions stated: "The government is not required to prove that the defendant knew that his

acts or omissions were unlawful." 551 F.3d at 939.

       Nevertheless, the court determined that any error in the instructions was harmless beyond

a reasonable doubt based on three different reasons. 551 F.3d at 940.  First, the court pointed out

that the certification on each of the claims the defendant submitted to Medicare informed him

that submitting "any false, incomplete or misleading information" could subject him to criminal

liability and punishment. <u>Id.</u>  Thus, the court explained, "the certifications themselves stated that

such submissions were unlawful."  <u>Id.</u>  Second, the court pointed out that the jury instructions

required proof that the defendant acted with an "intent to defraud," which was defined as "an

intent to deceive or cheat."  <u>Id.</u>  Consequently, "[n]o reasonable jury could have found that a

physician intended to deceive or cheat the Federal Government but did not know that such

conduct is unlawful, especially in light of the warnings on the claim forms." <u>Id.</u>[2]  Third, the court

explained that the fraudulent scheme carried out by the defendant "was, for the most part, so

bold and simple that no reasonable person could have thought it lawful." <u>Id.</u>  As described by the

court, the defendant billed for services not rendered – "in common parlance, theft." <u>Id.</u>

       In this case, the problematic statement that was the subject of the <u>Awad</u> case was not a

part of the instructions given to the jury. This Court defined "willfully," for purposes of Section

---

    [2]  The court also noted that the court gave a "good faith" instruction, and that by finding
the defendant guilty, "the jury necessarily rejected the argument that Defendant acted with a
good faith belief that his acts were lawful."  551 F.3d at 941.

10

1347, as follows: "A person acts willfully when that person acts deliberately, voluntarily, and intentionally." (Transcript of Closing and Jury Charge on December 9, 2005, at 90 (Docket No. 384 in Case No. 2:05-00003)).  The Court did not specifically instruct the jury that the Government had to prove that the Petitioner knew her conduct was unlawful, and neither of the parties requested such an instruction.

For the same reasons the <u>Awad</u> court found such an omission to be harmless, however, this Court finds that any failure by counsel to request such an instruction did not result in prejudice to the Petitioner.  As in <u>Awad</u>, the claim forms signed by the Petitioner informed her that the submission of false claims was unlawful.  The "Medicaid Payments (Provider Certification)" part of the claim form states:

> **SIGNATURE OF PHYSICIAN (OR SUPPLIER):** I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.
>
> NOTICE: This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

(Government's Trial Exhibit 11 in Case No. 2:05-0003) (Emphasis in original).

Second, as in <u>Awad</u>, the Court instructed the jury that they were required to find the Petitioner acted with an "intent to defraud," which required proof that the Petitioner acted "with an intent to deceive or cheat for the purpose of either causing a financial loss to another or bringing about financial gain to oneself." (Transcript of Jury Charge, at 90-91). The jury was also given a "good faith" instruction. (<u>Id.</u>, at 92-93).  Thus, as the <u>Awad</u> court concluded, no

11

reasonable jury could have found based on the evidence at Petitioner's trial that the Petitioner intended to deceive or cheat the federal government but did not know that her conduct was unlawful, especially in light of the notice contained on the claim forms.

Finally, the scheme for which Petitioner was convicted in this case, as in <u>Awad</u>, was a simple one, despite Petitioner's protestations to the contrary. The jury found that the Petitioner simply submitted claims for certain amounts of medications that she did not give to her patients. Thus, it is not reasonable to conclude that the Petitioner was unaware that her conduct was unlawful.

For these reasons, the Court holds that Petitioner was not prejudiced by any failure of counsel to request a <u>Ratzlaf</u> willfulness instruction.

Next, Petitioner argues that trial counsel should have directed the jury's attention to the fact that Agent Robert Turner's testimony at trial as to calculations of fraud loss did not include the "rounding up" allowed by Medicare rules for billing for units of drugs. Petitioner points out that the evidence at trial indicated that physicians were permitted to round up to the most commonly used dosages in billing for the drugs at issue in this case. (Trial Transcript, at 600-01, 609, 722, 725, 729-31 (Docket Nos. 297, 298 in Case No. 2:05-00003)). Petitioner argues that Agent Turner should have been challenged by defense counsel when he testified that he did not consider "rounding up" in his analysis.

To support her argument, Petitioner has filed the affidavit of Wendy Britton, a registered nurse who specializes in Medicare billing and coding. (Declaration of Wendy Britton (Docket No. 25-1)). According to Ms. Britton, Agent Turner's conclusion that the Petitioner committed fraud is wrong because he did not consider the "rounding up" process. (<u>Id</u>., at 8).

12

The portion of Agent Turner's testimony to which Petitioner refers occurred in the context of his explaining his creation of a spreadsheet, Trial Exhibit 57, entitled "Total Dosage Administered v. Total Dosage Purchased [Procrit]". (Trial Exhibit 57; Trial Transcript, at 1413-28 (Docket No. 302 in Case No. 2:05-00003)). The spreadsheet compares "drugs purchased" with "drugs purportedly administered" and produces the resulting amount of "fraud shortage." (Id.) Although the spreadsheet includes a column for "number of units billed," that number is not used in the "fraud shortage" calculation. (Id.) In addition, Agent Turner testified that "the rounding did not apply" in his analysis because the Petitioner always recorded the dosage administered as either 20 thousand units or 40 thousand units. (Trial Transcript, at 1427-28 (Docket No. 302 in Case No. 2:05-00003)).

In an affidavit filed by the Government, Agent Turner states that the charts he prepared and testified about at trial "compared the amounts of medicine that [the Petitioner] and her nurses *actually charted* having given to patients versus the amounts of these medicines *she purchased*." (Turner Declaration (Docket No. 14-2)(emphasis in original)). According to Agent Turner, "rounding up" applies to amounts *billed* to Medicare and was irrelevant to his analysis. (Id.) Had he compared "rounded up amounts" to "medicines purchased," Agent Turner states, the disparity, or fraud shortage, would have been even greater. (Id.)

The Court is not persuaded that the analysis of Petitioner's billing expert demonstrates prejudice with regard to the "rounding up" issue given Agent Turner's testimony that he used the amounts purportedly administered, prior to any rounding, as compared to the amounts purchased in arriving at a fraud shortage. Petitioner has simply not established that there is a reasonable probability the outcome of the trial would have been different had trial counsel focused on the

13

rounding issue.

Furthermore, the Court is not persuaded that Petitioner has established that trial counsel was deficient through any failure to focus on the rounding issue. In that regard, the Government has filed the affidavit of Stephen Ross Johnson, one of Petitioner's trial attorneys. (Declaration of Stephen Ross Johnson (Docket No. 32)). Petitioner's lead trial attorney, Robert Ritchie, died after the trial was held in this matter. (Id.) In his affidavit, Mr. Johnson states that prior to trial, counsel engaged healthcare consulting firm Hooper-Cornell in Boise, Idaho to conduct an independent analysis of the records. (Id., at ¶ 10). The firm also hired a separate accounting firm in Knoxville and a former Federal Bureau of Investigation Special Agent Accountant and Inspector General to conduct an analysis of the records. (Id.) According to Mr. Johnson, the defense team considered the rounding issue in preparing its defense:

> In the course of our review of this issue, we explored all explanations for the discrepancy that we could conceivably develop, to include rounding issues, manufacturer overfill in the medication containers, nurse charting errors, incorrect financial recordkeeping in both Dr. Moon's office and with the various insurance companies, and any issues concerning accidental billing errors due to the complexity of the regulatory and billing schemes. In some fashion, we raised all of these issues through our cross-examination of the government's witnesses at trial and the presentation of the defense proof. However, no one explanation or combination of them could account for the significant discrepancies with each medication at issue between amounts purchased and amounts billed according to our analysis and that of the consultants we hired, to include the rounding issue.

> * * *

> With no one explanation for the significant discrepancy between (a) amounts purchased and (b) amounts charted and billed, we chose to attack the government's proof by raising reasonable doubt on the purchasing and billing records through pointing out the various ways the records could be inaccurate, which included rounding, charting errors, overfill, inaccurate insurance computer summaries, etc., and to also show through expert medical proof how the symptoms reported from patient reaction to chemotherapy in Dr. Moon's medical records were consistent with the levels of medication that Dr. Moon charted in her

14

patients' medical records and billed insurance.

(Docket No. 32, at ¶¶ 10, 12).[3]

Trial counsel's statements, which have not been refuted by the Petitioner[4], indicate that Petitioner's trial team performed a thorough investigation and decided on a reasonable defense strategy based on that investigation.  As the Supreme Court explained in Strickland, "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." 466 U.S. at 690.  See also Wood v. Allen, ___ U.S. ___, 2010 WL 173369, at *6-7 (Jan. 20, 2010).  That Petitioner has now retained an expert who disagrees with the various experts with whom the defense team consulted does not suggest that the defense team provided defective representation by relying on those experts. Petitioner has not demonstrated that she received ineffective assistance on the "rounding up" issue.

Petitioner next contends that trial counsel should have objected to the Court's jury instruction on reasonable doubt. Petitioner argues, based on Stoltie v. California, 501 F.Supp. 2d 1252 (C.D. Ca. 2007), that counsel should have requested that the Court charge the jury that

---

[3]  The Court also notes that the defense specifically asked about "rounding up" on cross examination of Colleen Carpenter, an employee of the Centers for Medicare and Medicaid Services.  (Trial Transcript, at 725 (Docket No. 298 in Case No. 2:05-00003)).

[4]  Petitioner argues that Mr. Johnson's affidavit "proves nothing" because (a) she is still entitled to an evidentiary hearing; (b) Mr. Johnson's co-counsel, Mr. Ritchie, conducted pretrial investigation prior to Mr. Johnson's involvement; and (c) Mr. Johnson was not lead counsel, but just a member of the defense team. (Docket No. 33).  As noted above, the portion of Mr. Johnson's affidavit upon which the Court relies recounts the defense team's pretrial investigation, including the engagement of various experts to assist in formulating a trial strategy. Mr. Johnson's affidavit indicates that he has personal knowledge of the events he describes despite his status as "co-counsel" and despite Mr. Ritchie's having worked on the case prior to his involvement. Petitioner has provided no evidence indicating this information is false, and Petitioner has not suggested any factual dispute to be resolved at an evidentiary hearing.

15

"reasonable doubt" requires proof of each element of the offense to a "near certainty."

In Stoltie, 501 F.Supp.2d at 1266-67, the court held that an example given by a state trial judge to explain the meaning of the phrase "reasonable doubt" violated the defendant's due process rights as defined in In re Winship, 367 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). During deliberations, the jury had repeatedly asked questions regarding the meaning of the phrase, and the trial court ultimately used an analogy, which the federal court characterized as requiring "extreme doubt," to acquit the defendant:

> The last instruction the jury received before resuming deliberations essentially told them to acquit only if the prosecution's case was as impossible to believe as a person skiing in 109 degree heat in the California desert.

501 F.Supp.2d at 1266.

The Court is not persuaded that the holding of Stoltie supports the argument that "reasonable doubt" equates to "near certainty." In any event, the instructions given in Stoltie were not used in the Petitioner's trial. In Petitioner's case, this Court defined "reasonable doubt" as follows:

> I am going to talk about beyond a reasonable doubt. The government must prove every element of the crime charged beyond a reasonable doubt. Proof beyond a reasonable doubt does not mean proof beyond all possible doubt. Possible doubt or doubts based purely on speculation are not reasonable doubt. A reasonable doubt is a doubt based on reason and common sense. It may arise from the evidence, the lack of evidence, or the nature of the evidence.
>
> Proof beyond a reasonable doubt means proof which is so convincing that you would not hesitate to rely and act upon it in making the most important decisions in your lives. If you are convinced that the government has proved the defendant guilty beyond a reasonable doubt, say so by returning a guilty verdict against the defendant.
>
> If you are not convinced, say so by returning a verdict of not guilty.

(Transcript of Closing and Jury Charge on December 9, 2005, at 73 (Docket No. 384 in Case No.

16

2:05-00003)).[5]

This "reasonable doubt" instruction is Pattern Instruction 1.03 from the Sixth Circuit's Pattern Criminal Jury Instructions, and its use in particular cases has been approved by the court. See, e.g., United States v. Hynes, 467 F.3d 951, 957 (6th Cir. 2006); United States v. Stewart, 306 F.3d 295, 306-07 (6th Cir. 2002); United States v. Goodlett, 3 F.3d 976, 978-80 (6th Cir. 1993). Petitioner has not cited any persuasive authority indicating that this pattern instruction is unconstitutional, nor has she suggested an alternative definition that should have been requested by trial counsel.

Petitioner has not shown that trial counsel was ineffective for failing to object to the Court's reasonable doubt instruction, and this claim is without merit.

2. Sentencing counsel

Petitioner argues that sentencing counsel was ineffective based on the following grounds: (1) failure to object to use of the 2005 Sentencing Guidelines Manual at sentencing; (2) failure to object to the use of "intended loss" instead of "actual loss" in computing the base offense level; (3) failure to produce expert testimony showing there was no connection between the claim of false billing and reckless endangerment of the patient; and (4) failure to request a downward departure based on overlapping enhancements.

Petitioner was sentenced on April 24, 2006, and the Court applied the 2005 Sentencing Guidelines Manual, specifically Sentencing Guideline 2B1.1, in determining the base offense

_____

[5]  Petitioner also quotes from the Court's instructions regarding the elements of health care fraud and one on "deliberate ignorance."  She does not, however, explain how these instructions amounted to error.  The Court notes that the instruction for deliberate ignorance is Sixth Circuit Pattern Instruction 2.09, and has been specifically approved in particular cases. See, e.g., Mari v. United States, 47 F.3d 782, 785 (6th Cir. 1995)(deliberate ignorance).

17

level for health care fraud. (Pre-Sentence Investigation Report, at ¶ 29). Petitioner argues that trial counsel should have requested use of the November 1, 2000 Sentencing Guidelines Manual, which would have required application of Sentencing Guideline 2F1.1 for determining the base offense level for health care fraud, rather than Section 2B1.1. Under Section 2F1.1, only 11 levels are added for the amount of fraud loss, in this case, $1,295,653. (Transcript of Sentencing, at 113 (Docket No. 306 in Case No. 2:05-0003)). Under Section 2B1.1, 16 levels are added for the amount of fraud loss. Consequently, Petitioner argues, her Sentencing Guideline range would have decreased from 188 to 235 months of imprisonment to a range of 108-135 months of imprisonment.

Section 1B1.11 states that the court "shall use the Guidelines Manual in effect on the date that the defendant is sentenced," unless doing so would violate the ex post facto clause of the United States Constitution, in which case, the court is to apply the Guidelines Manual in effect on the date that the offense of conviction was committed. The Application Notes provide that the "last date of the offense of conviction is the controlling date for ex post facto purposes." (§ 1B1.1, App. Note 2).

The Indictment charged the Petitioner with engaging in health care fraud in billing for Taxol from on or about June 30, 1999 through January 9, 2002 (Count One); in billing for Camptosar from on or about July 13, 1999 through January 9, 2002 (Count Two); and in billing for Procrit from on or about October 9, 2000 through January 8, 2002 (Count Three). (Docket No. 1 in Case No. 2:05-00003). Testimony at the trial and the Government's exhibits supported use of these dates. (Trial Transcript, at 1453-1454 (Docket No. 302 in Case No. 2:05-00003; Government Exhibits 60, 61, 62 in Case No. 2:05-00003). The Jury ultimately determined that

18

the Petitioner was guilty of these three counts of the Indictment. (Docket No. 206 in Case No. 2:05-00003). Consequently, January, 2002 is the controlling date for determining the appropriate edition of the Sentencing Guidelines Manual. Because the applicable guideline, Section 2B1.1, was unchanged from January, 2002 until the date of sentencing in April, 2006, the Court appropriately used the edition of the Sentencing Guidelines Manual in effect on that date – the 2005 edition. Therefore, sentencing counsel was not ineffective for failing to request use of a different edition of the Sentencing Guidelines Manual.[6]

Next, Petitioner argues that sentencing counsel should have objected to the use of "intended loss" instead of "actual loss" in computing the base offense level. Application Note 2 to Sentencing Guideline 2B1.1 provides that for purposes of the guideline, "loss is the greater of actual loss or intended loss." The Application Note defines "actual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense." "Intended loss" is defined as "(I) the pecuniary harm that was intended to result from the offense; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value)."

In arguing that counsel should have requested the use of actual loss rather than intended

---

[6] Petitioner also appears to argue that trial counsel should have requested a special verdict form requiring the jurors to specify the termination date for the criminal activity. Trial counsel filed a proposed verdict form that was seven pages long, and included questions that specified the dates of criminal activity for each count. (Docket No. 112 in Case No. 2:05-00003). Thus, Petitioner has not established that trial counsel was defective in failing to request a special verdict form. The Court did not use the verdict form proposed by defense counsel, and instead, formulated questions that referred the jury to the count under consideration, which included a date range for the criminal conduct alleged. (Docket No. 206 in Case No. 2:05-00003). Petitioner has not shown that she was prejudiced by the verdict form used by the Court in this case.

19

loss, the Petitioner contends that actual loss represented the most reliable measurement of the harm caused by the offense behavior and that intended loss exaggerated the offense behavior, and cites United States v. Singh, 390 F.3d 168 (2nd Cir. 2004) to support her argument.  In Singh, the Second Circuit, in applying Sentencing Guideline 2F1.1 (the predecessor to § 2B1.1), remanded to the district court the question of whether the intended loss was the amount fraudulently billed to health care benefit programs or the lesser amount routinely paid by the insurers. 168 F.3d 193-94.  The defendant in Singh argued that he did not "intend" to receive the full amounts billed because the insurance companies routinely capped reimbursement amounts for services. Id.

The Petitioner also cites the Sixth Circuit's decision in United States v. Triana, 468 F.3d 308 (6th Cir. 2006) as supporting her argument that actual loss should be used instead of intended loss in cases of health care fraud.  In Triana, the court, in reciting the district court's holding, noted that the district court used the amount of funds the defendant received from Medicare, approximately $1.7 million, as the amount of loss for sentencing, rather than the $2.9 million the defendant billed to Medicare.  Id., at 320.  The Government did not appeal that decision. Id. Rather, the defendant challenged the decision that Medicare suffered *any* loss because the Medicare recipients received legitimate medical services. Id., at 320-21.  In rejecting that argument, the court pointed out that the defendant was ineligible for the receipt of any Medicare funds based on an earlier plea agreement with the Government. Id., at 321.

In a more recent case, the Sixth Circuit has cast doubt on the holding in Triana:

> Brown argues that 'for purposes of determining the loss figure, the amounts billed should not be used, because no one – neither BCBSM nor Medicare nor defendant nor the patients – expected the full amount billed by the doctor to be paid.' Brown cites Triana as an example of the Sixth Circuit affirming a district

20

court's sentencing calculations based on actual loss instead of intended loss. However, in Triana, the government did not appeal the district court's calculation. Furthermore, our tacit acceptance in a previous case of a loss calculation based on actual, rather than intended, loss does not mean that a district court would have committed clear error by ruling otherwise.

A comment to the Guidelines states that 'loss is the greater of actual loss or intended loss.' U.S.S.G. § 2B1.1 n. 3(A). Brown concedes that 'punishment for fraud is determined in large part upon what the defendant attempted to obtain.' The district court found that the best evidence of what Brown 'attempted to obtain' was the fraudulent bills that he submitted to BCBSM. At Brown's sentencing hearing, counsel argued that Brown did not expect to receive the entire amount billed. But he offered no evidence to support that assertion. Brown never testified about his own intent or offered evidence showing that he knew what amounts BCBSM was likely to pay out. Because he failed to do so, the district did not clearly err in find that the bills represented the amount that Brown hoped to obtain. See United States v. Miller, 316 F.3d 495, 504,05 (4th Cir. 2003).

United States v. Culberson, 2009 WL 776106 (6th Cir. Mar. 24, 2009).

Despite Petitioner's contention, her sentencing counsel did raise this argument at sentencing during cross examination and argument to the Court. One of counsel's arguments for lowering the amount of loss requested by the Government was because "everybody understands that the way billing works is there is a certain percentage that is discounted through a contract that you have in order for using in-network providers. . . So just because a doctor sends in a bill for any kind of services on your EOB [explanation of benefits] for the amount, that's not what the doctor would even expect to get back." (Transcript of Sentencing Hearing, at 111 (Docket No. 306)). The Court rejected counsel's argument, and determined that the amount billed by the Petitioner was the appropriate amount of loss for purposes of U.S.S.G. § 2B1.1. (Rule 32(c)(1) Findings and Determinations, at ¶ 2 (Docket No. 290)).

Thus, the record does not support Petitioner's argument that sentencing counsel failed to raise the argument. In any event, the Court is not persuaded that failure to raise such an

21

argument rises to ineffective assistance. As the <u>Culberson</u> court explained, the <u>Triana</u> court's tacit acceptance of a loss amount which was less than that billed to the insurance carrier does not indicate that the court determined that loss amount to be the appropriate one. Neither party raised the issue in that case. Furthermore, as in <u>Culberson</u>, Petitioner presents no persuasive evidence that prior reimbursement amounts were less than the full amount billed, nor does she state the specific amount for which she expected to receive reimbursement. Accordingly, this claim is without merit.

Petitioner argues that sentencing counsel should have produced expert testimony that there was no connection between the claim of false billing and the specific offense characteristic of reckless endangerment of the patient under U.S.S.G. § 2B1.1(b)(12)(A). Petitioner contends that Dr. Kenneth Foon, the expert called by the defense at trial, would have testified at the sentencing that because of the complexities of administering Camptosar and Procrit, the Federal Drug Administration and the drugs' manufacturers emphasize that a physician must exercise his or her discretion to give the lowest dosage needed. Consequently, according to the Petitioner, the dosage amount of these drugs she gave to her patients did not endanger or victimize them.

Petitioner has not shown she was prejudiced by the alleged failure to call Dr. Foon at sentencing. Although sentencing counsel did not call Dr. Foon to testify at the sentencing, she referred to his trial testimony in arguing that those alleged to be victims of the Petitioner's crime did not suffer harm as a proximate result of Petitioner's conduct. (Sentencing Transcript, at 11). In response, the Court stated: "I remember his testimony." (<u>Id.</u>) It was appropriate for the Court to rely on the trial record, including the testimony of Dr. Foon, in making its sentencing determinations. <u>See</u>, <u>e.g.</u>, <u>United States v. Grayson</u>, 438 U.S. 41, 98 S.Ct. 2610, 2615, 57

22

L.Ed.2d 582 (1978)("Thus, we have acknowledged that a sentencing authority may legitimately consider the evidence heard during trial. . .") The Court simply rejected that testimony, and credited the testimony of the Government's expert, Dr. Mace Rothenberg. (Rule 32(c)(1) Findings and Determinations, at ¶ 5 (Docket No. 290 in Case No. 2:05-00003)). This issue is without merit.

Finally, Petitioner argues that sentencing counsel should have requested a downward departure based on the number and magnitude of overlapping enhancements. Petitioner does not specify which of the enhancements applied by the Court should have been challenged as overlapping, nor does she establish that application of the enhancements was otherwise improper. This issue is without merit.

For the reasons discussed above, despite her numerous objections, Petitioner has not shown that she received the ineffective assistance of counsel. Thus, the Court concludes that Petitioner's ineffective assistance claims are without merit and are dismissed.

D. Ex Post Facto and Due Process

Finally, Petitioner argues that use of the 2005 Sentencing Guidelines Manual at sentencing violated the Ex Post Facto and Due Process Clauses. As discussed above, use of the 2005 Manual was proper and did not violate the Ex Post Facto Clause, nor the Due Process Clause. This claim is without merit.

IV. Conclusion

For the reasons set forth herein, the Court concludes that Petitioner is not entitled to relief under 28 U.S.C. § 2255. Therefore, the Petitioner's Motion Under § 2255 is denied, and this

23

action is dismissed.

Should the Petitioner give timely notice of an appeal from this Memorandum and Order, such notice shall be treated as a application for a certificate of appealability, 28 U.S.C. 2253(c), which will not issue because the Petitioner has failed to make a substantial showing of the denial of a constitutional right. <u>Castro v. United States</u>, 310 F.3d 900 (6th Cir. 2002).

It is so ORDERED.

TODD J. CAMPBELL
UNITED STATES DISTRICT JUDGE